IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LM INSURANCE CORPORATION ) | FILED: APRIL 25, 2008 |
| ) | 08CV2372 EDA |
| Plaintiff, ) | JUDGE NORDBERG |
| ) | MAGISTRATE JUDGE COLE |
| -vs- ) | |
| ) | |
| ACEO, INC. and ALLIANCE INSURANCE ) | |
| GROUP, INC. ) | |
| ) | |
| Defendants. ) | |

## COMPLAINT AT LAW

NOW COMES the Plaintiff, LM Insurance Corporation, by and through its attorney, James

T. Barnes, Esq., and complaining against Defendant ACEO, Inc. and Defendant Alliance Insurance

Group, Inc., the Plaintiff respectfully states as follows:

### I.  PARTIES AND JURISDICTION

**1.**     Plaintiff LM Insurance Corporation ("LM") is an Iowa corporation whose principal

place of business is located in the Commonwealth of Massachusetts.

**2.**     Defendant ACEO, Inc. ("ACEO") is believed to be a Texas corporation whose

principal place of business is located in the State of Missouri.

**3.**     Defendant Alliance Insurance Group, Inc. ("Alliance Insurance") is believed to be

a Missouri corporation whose principal place of business is located in the state of Missouri.

**4.**     On information and belief, there is complete diversity of citizenship between the

Plaintiff and the Defendants, and the amount in controversy exceeds $75,000.00, exclusive of

interest and court costs.

**5.**     The jurisdictional basis for this action is Title 28 U.S.C. §1332(a), and venue is proper pursuant to Title 28 U.S.C. §1391(a).

## II.  FACTUAL BACKGROUND

### A:  The Illinois Workers' Compensation Act and The Workers' Compensation Insurance Plan

**6.**     The Illinois Workers' Compensation Act ("the Act") was enacted by the Illinois Legislature to provide statutory recovery for  injured workers.  The Act is administered and implemented to protect and provide for employees injured in the course of their employment.  To ensure compliance with the Act, Illinois law requires virtually all employers to insure their entire employee exposure.

**7.**     The Act broadly construes the definition of an employee.  Where an employer-employee relationship exists, an exposure arises for the insurance company that is providing workers' compensation insurance coverage to the employer.  The insurance company's exposure exists independent of any agreement, statement, or actions on the employer's part and exists even where the employer breaches the insurance contract.  Neither the employer nor the employee can waive their rights, obligations or remedies arising under the Act.

**8.**     In Illinois, as in other States, some employers are unable to find an insurance company that will voluntarily sell them workers' compensation insurance.  Therefore, in order to meet the workers' compensation  insurance needs of employers who are unable to obtain coverage through the voluntary market, the legislatures of the several states have authorized the use of a residual market mechanism and a workers' compensation insurance plan.

9.      The Workers' Compensation Insurance Plan ("the Plan") promulgated by the legislatures of the several states, are a set of rules governing the assignment, administration, and issuance of policies written for eligible employers.  In most states, the National Council on Compensation Insurance, Inc. ("the NCCI") has been appointed as the licensed administrator of the Plan.

10.     To apply for workers' compensation insurance coverage under the Plan, an employer is required to accurately complete a written application on an approved form.  Specifically, the employer is required to calculate the estimated annual premium and to accurately report the location of its business activities; the nature of its business activities; the number of employees and the classification of those employees; the payroll by classification; the states where the employer has exposure; and the correct legal identity of the company seeking insurance.

11.     The information required on the application form is critical to the proper and efficient functioning of the Plan because the application form is used both to determine whether the employer's calculation of the premium is correct and also to determine whether the employer is eligible for coverage under the Plan.  Therefore, the employer is required to certify that the employer has read and understood the statements made on the application form and that the information provided and statements made by the employer on the application form are true.

12.     Further, under the rules and regulation of the Plan, it is the employer's and insurance producer's duty and responsibility to keep the insurance company fully advised of changes in name, ownership, operations, payroll, locations, or other new exposures resulting from the expansion of operations that would effect coverage, classifications, rates, premium estimates, or other aspects of the coverage.

13.    Upon receipt and review of the application, the Administrator of the Plan (i.e., the NCCI) issues a written insurance binder to the employer and concurrently assigns the employer to an insurance company on a random basis.  The completed application is then forwarded to the assigned insurance company, who in turn issues a policy of workers' compensation insurance in its own name and provides the requisite administrative services for the benefit of the insured-employer and any claimants.

14.    Once a policy has been issued through the Plan, the ability of the insurer to cancel the policy is restricted to a limited number of reasons, and same usually requires the permission of either the Plan administrator (i.e., the NCCI) and/or the state's insurance regulator.

### B:  PEO's and Workers' Compensation Insurance

15.    Employee leasing companies, also known as a professional employer organizations ("PEO"), provide to their clients various human resource, payroll and workers' compensation insurance services - and hold themselves out as experts in these areas to their clients.

16.    A PEO is able to offer these services by entering into a "co-employment" relationship with its clients.  This relationship is typically documented by a Client Service Agreement between the PEO and its client.  Based on the co-employment relationship, the PEO is able to obtain workers' compensation insurance coverage on behalf of its client.

17.    Each state generally has its own statutes governing the licensing of a PEO and sets the requirements for meeting the workers' compensation obligation.

18.    In Illinois, PEO's are governed by the Employee Leasing Company Act which, pursuant to 215 ILCS 113/5, exists for the following reasons:

4

For the purpose of ensuring that an employer that leases some or all of its workers properly obtains workers' compensation insurance coverage for all of its employees, including those leased from another entity , and that premium is paid commensurate with exposure and anticipated claim experience, this Act is required to regulate employee leasing companies.

19.　　ACEO is a PEO, and has so registered itself with the State of Illinois, as required by the Illinois Employee Leasing Company Act.

20.　　The two owners of ACEO (being Roy Hombs and David Jatho), are or were licensed by the State of Illinois.  Specifically, Roy Hombs is or was licensed as a non-resident producer, and David Jatho is or was licensed as a limited representative.

21.　　As a licensed Illinois PEO, ACEO is required to maintain accounting and employment records relating to all employee leasing arrangements for a minimum of four calendar years, pursuant to 215 ILCS 113/25(a).

22.　　In its capacity as an Illinois PEO employer, ACEO obtained statutory Illinois workers' compensation insurance coverage for its clients' Illinois employees under a policy of insurance issued by Plaintiff LM, and which included the Illinois Amendatory Endorsement.

23.　　The total "Audited Premium" of the policy issued by Plaintiff LM to Defendant ACEO is $3,934,194.00 - of which $3,884,985.00 is attributable to exposure located in Illinois, $48,952.00 is attributable to exposure located in Kansas and $257.00 is attributable to exposure located in Nevada.  Thus, the portion of the Audited Premium attributable to the Illinois exposure constitutes over 98% of the total Audited Premium amount.

24.　　The total "Audited Premium" figure is derived from, and based upon, a total payroll exposure of approximately twenty-nine million dollars, of which approximately twenty-eight and a half million dollars is attributable to Illinois.

5

25.     The Illinois claims that arose under the policy of insurance issued by Plaintiff LM to Defendant ACEO were administered by Plaintiff LM from its office in Peoria, Illinois.

26.     The premium payments that were made by ACEO under the policy of insurance issued by Plaintiff LM were sent to Chicago, Illinois.

### C:  ACEO's Application to the Plan and LM's Insurance Coverage

27.     Defendant Alliance Insurance is an insurance producer who is located at the same street address as Defendant ACEO.

28.     Alliance Insurance is believed to be affiliated with ACEO and to have common ownership with ACEO.

29.     In May of 2006, Defendant ACEO, by and through Defendant Alliance Insurance, submitted an application for workers' compensation insurance coverage to the Nevada Plan.

30.     In its application, ACEO described itself as a temporary staffing company, and ACEO answered in the negative when it was asked whether it leased employees to or from any other employers.  ACEO's President affirmatively represented that ACEO "...provides employees and services on a temporary basis to companies as a substitute for permanent employment."

31.     In its application, ACEO also answered in the negative when it was asked whether there were any undisputed or unpaid workers' compensation insurance premiums from either ACEO itself or any other commonly owned or managed companies.

32.     ACEO's application represented that it had a relatively small payroll exposure (of $67,000) in two class codes, resulting in a total estimated premium of only $2,838.

33.     In calendar year 2006, ACEO had total gross wages in excess of thirty-five million dollars, and had total gross revenues in excess of forty-five million dollars.

**34.** In consequence of the representations contained in ACEO's application, and in consideration of ACEO's promise to pay premiums and to otherwise fully comply with all pertinent terms and conditions of the insurance policy and the rules and regulations of the Plan, LM issued and provided to ACEO workers' compensation insurance policy #WC5-39S-305812-016 ("the LM Policy"), which covered the period of time from May 8, 2006 through May 8, 2007.

**35.** The LM Policy was subsequently cancelled effective April 10, 2007.

**36.** Under the Plan, the contractual language of the insurance policy at issue is statutory in nature. Regarding premiums, the pertinent section of the LM Policy is Part FIVE, entitled "PREMIUMS", which states as follows:

A. Our Manuals

All premium for this policy will be determined by our manuals of rules, rates, rating plans and classifications. We may change our manuals and apply the changes to this policy if authorized by law or a governmental agency regulating this insurance.

B. Classifications

Item 4 of the Information Page shows the rate and premium basis for certain business or work classifications. These classifications were assigned based on an estimate of the exposures you would have during the policy period. If your actual exposures are not properly described by those classifications, we will assign proper classifications, rates and premium basis by endorsement to this policy.

C. Remuneration

Premium for each work classification is determined by multiplying a rate times a premium basis. Remuneration is the most common premium basis. This premium basis includes payroll and all other remuneration paid or payable during the policy period for the services of:

1.      All your officers and employees engaged in work covered by this policy; and

2.      All other persons engaged in work that could make us liable under Part One (Workers Compensation Insurance) of this policy. If you do not have payroll records for these persons, the contract price for their services and materials may be used as the premium basis. This paragraph 2 will not apply if you give us proof that the employers of these persons lawfully secured their workers compensation obligations.

D.      Premium Payments

You will pay all premium when due. You will pay the premium even if part or all of a workers compensation law is not valid.

E.      Final Premium

The premium shown on the Information Page, schedules, and endorsements is an estimate. The final premium will be determined after this policy ends by using the actual, not the estimated, premium basis and the proper classifications and rates that lawfully apply to the business and work covered by this policy. If the final premium is more than the premium you paid to us, you must pay us the balance. If it is less, we will refund the balance to you. The final premium will not be less than the highest minimum premium for the classifications covered by this policy.

If this policy is canceled, final premium will be determined in the following way unless our manuals provide otherwise:

1.      If we cancel, final premium will be calculated pro rata based on the time this policy was in force. Final premium will not be less than the pro rata share of the minimum premium.

2.      If you cancel, final premium will be more than pro rata; it will be based on the time this policy was in force, and increased by our short-rate cancellation table and procedure. Final premium will not be less than the minimum premium.

8

F.      Records

You will keep records of information needed to compute premium. You will provide us with copies of those records when we ask for them.

G.      Audit

You will let us examine and audit all your records that relate to this policy. These records include ledgers, journals, registers, vouchers, contracts, tax reports, payroll and disbursement records, and programs for storing and retrieving data. We may conduct the audits during regular business hours during the policy period and within three years after the policy period ends. Information developed by audit will be used to determine final premium. Insurance rate service organizations have the same rights we have under this provision.

### D:  Illinois Coverage: the LM Policy and the AIG Policy

**37.**     On or about July 13, 2006, Plaintiff LM received a request from Defendant Alliance Insurance (based on a letter dated June 30, 2006) to add coverage for the State of Illinois and the State of Kansas. Alliance Insurance stated that the Kansas payroll exposure was $130,000 and that there was currently no exposure in Illinois, but that ACEO is "...currently working with a few companies about contracting with them."

**38.**     Based on Alliance Insurance's request, on or about July 14, 2006, coverage was added for the States of Illinois and Kansas. Ultimately, under the LM Policy, ACEO had payroll exposure in Illinois in excess of twenty-eight million dollars.

**39.**     At approximately the same time that the above-referenced matters were occurring, ACEO was also obtaining Illinois coverage in the voluntary market.

**40.**     Specifically, on or about June 26, 2006, ACEO obtained coverage from American Home Assurance Company, a member of American International Group ("the AIG Policy").

9

**41.** Neither Defendant ACEO nor Defendant Alliance Insurance informed Plaintiff that ACEO had obtained coverage in the voluntary market through the AIG Policy.

**42.** Under the rules and regulations of the Plan, once ACEO had obtained coverage in the voluntary market, it was by definition ineligible for coverage in the involuntary market (i.e., through the Plan).

**43.** The AIG Policy overlapped, but did not replace, the coverage provided by LM. Thus, ACEO was "splitting" the Illinois exposure between a Plan policy and a non-Plan policy.

**44.** However, as an insurance carrier operating subject to the rules and regulations of the Plan, LM is contractually required to insure the entire exposure of all employees of the named insured as listed under Item 3A of its policy (and as subsequently amended by endorsement). Similarly, LM is required to exclude all exposure not listed under Item 3A of the policy (or as subsequently amended by endorsement).

**45.** The named insured under the LM Policy (as set forth at Item 1 of the policy) is ACEO, and the premiums are derived from the payroll of all ACEO's "...officers and employees engaged in work covered by this policy."

**46.** As previously set forth herein at paragraphs 8-14, the Plan is the insurer of last resort and exists to provide employers with coverage when same cannot be obtained in the voluntary market. The Plan does not exist as a tool to be utilized in connection with the voluntary market for the business convenience and economic profit of a PEO business.

**47.** Permitting a PEO entity to deliberately split exposures between the voluntary and involuntary market would subject the several states to serious issues with respect to the financial solvency and integrity of their respective Plans.

10

**48.** Moreover, because ACEO has refused to provide complete audit records, Plaintiff LM has no way of knowing whether or not the entire Illinois payroll exposure has in fact been reported as between the LM Policy and the AIG Policy (and this is another reason why splitting of coverage is not permitted).

**49.** If in fact ACEO was not insuring its entire Illinois exposure, then it would be in direct violation of Section 30(a) of the Illinois Employee Leasing Act pursuant to 215 ILCS 113/30(a).

**50.** ACEO's refusal to permit a complete audit of its Illinois exposure is in violation of the rules and regulations of the Plan, and also constitutes a breach of the contractual language of the LM Policy.

**51.** Defendant ACEO, as a PEO, knew or reasonably should have known that its conduct was improper.

**52.** Defendant Alliance Insurance, as an insurance producer, also knew or reasonably should have known that its conduct was improper.

**E: When ACEO Submitted its Application, it was Ineligible for Plan Coverage**

**53.** Before the above facts had become known to the Plaintiff, on or about December 8, 2006, LM began an internal investigation of ACEO based on the discovery of a certificate of insurance issued for a client of ACEO with undisclosed operations based in Wisconsin.

**54.** In consequence of LM's research, LM wrote to ACEO on January 4, 2007 to inform ACEO that cancellation of the LM Policy would be sought because ACEO was ineligible for coverage because a company affiliated with ACEO had an outstanding premium debt on a policy obtained through the Plan.

**55.** Specifically, LM's correspondence stated the following:

A recent review of Liberty Mutual's files indicates ACEO, Inc., FEI# 20-2148663 is owned by Mr. David Jatho (50%) and Mr. Roy Hombs (50%). Liberty Mutual's files indicate Mr. Jatho serves as the president of ACEO, Inc. and Mr. Hombs serves as the Secretary of ACEO, Inc.

Liberty Mutual's files also indicate that Messrs. Jatho and Hombs purchased Total HR Employer Services, Inc., FEI# 73-1668964 on May 24, 2004 with each owning 50% of the company. Liberty Mutual's records also indicate that Total HR Employer Services, Inc. currently owes Liberty Mutual $215,361 for the WC5-34S-372269-034 policy which was effective May 24, 2004 to April 1, 2005. Liberty Mutual has no record of arrangements being made to pay the balance.

In accordance to the NCCI's Workers' Compensation Insurance Plan's (WCIP) Good Faith Rules of Eligibility, ACEO, Inc., the "Employer", is ineligible for coverage due to the outstanding Workers' Compensation premium obligation for the WC5-34S-372269-034 policy. Under the WCIP rules, an "Employer" includes any business organization or enterprise that is or was affiliated at any time as a result of common ownership or management.

56.     Based on the above-referenced debt, ACEO was in fact ineligible for coverage at the time it submitted its application for coverage.

57.     Moreover, in its application, ACEO was asked whether there were any undisputed or unpaid workers' compensation insurance premiums from either ACEO itself or any other commonly owned or managed companies. ACEO's response to this question, which was "No", was factually incorrect.

58.     On March 1, 2007 the NCCI instructed LM to cancel the LM Policy due to an undisputed premium debt owed to the Plan. On March 6, 2007, LM sent a cancellation notice to ACEO, with cancellation to be effective April 10, 2007, in accordance with the NCCI request.

59.     On or about April 26, 2007, LM confirmed with the NCCI that the April 10th cancellation date was to remain in effect (even though the Total HR debt had been resolved) because

there also existed an undisputed Plan premium debt owing to Travelers (of approximately $400,000) and an undisputed Plan premium debt owing to Virginia Surety (of approximately $200,000).

60.     On May 2, 2007, the NCCI issued a letter to LM which stated that, as of May 1, 2007, ACEO had re-established eligibility for Plan coverage and therefore LM should, "Please correct your records to reflect that the employer [i.e., ACEO] is now eligible for assigned risk coverage, providing all other Plan or policy requirements have been met."

61.     On or about May 4, 2007, LM wrote to ACEO regarding its eligibility based on the NCCI's letter of May 2nd.  The correspondence stated as follows:

> Liberty Mutual has been advised by the NCCI in a letter dated May 2, 2007 that ACEO, Inc has re-established its eligibility for coverage as of May 1, 2007.

> ACEO, Inc. should contact the NCCI to reactivate the recently submitted application for its Nevada leasing operations.  However, ACEO, Inc will need to provide additional documentation to conform with NV leasing statutes and NCCI leasing rules.  Your agent will be able to assist you in submitting the necessary documentation.

> Since receiving your initial request to add the state of IL, records show ACEO, Inc currently has Workers' Compensation coverage in the State of Illinois with American Home Insurance [i.e., the AIG Policy].  Therefore ACEO, Inc would not be eligible for separate coverage under IL Plan rules.

> Lastly, ACEO, Inc will need to re-apply to the NCCI for coverage in Kansas as Liberty Mutual is no longer a servicing carrier in that state.

62.     The extent of ACEO's corporate relationships was subsequently documented in an NCCI correspondence of June 28, 2007, wherein the NCCI ruled that ACEO, Inc. was combinable with the following entities: AHJ, LLC; Alliance Personnel Solutions, LLC; BIM Enterprises, LLC; Corporate Management Company, Inc.; MIB Enterprises, LLC; NV Woody Management, LLC;

Performance HR, Ltd.; The Alliance Companies, Inc.; Total HR Employer Services, Inc.; Use, LLC and Woody Productions, LLC.

### F: The ACEO Audit

63.     On June 6, 2006, LM's auditor had a telephone conversation with Mike Adams (of ACEO) regarding conducting a preliminary test audit. On June 13, 2006, LM's auditor left a follow up message with Mike Adams regarding conducting a preliminary test audit. On June 15, 2006, LM's auditor sent a correspondence to Mike Adams regarding the necessity for conducting a preliminary test audit and the documents which would need to be made available for same. On June 27, 2006, ACEO's preliminary test audit was closed out as non-compliant.

64.     On June 28, 2006, LM requested cancellation due to ACEO's non-cooperation with the audit. On July 13, 2006, the policy was reinstated (from its status of pending cancellation for audit non-compliance) based on Alliance Insurance's representations to LM that there was an appointment and that ACEO intended to cooperate with the audit process.

65.     Subsequently, in confirmation of a January 22, 2007 phone conversation, LM wrote to ACEO on January 31, 2007 to confirm an audit scheduled for March 1, 2007 and to reiterate the documentation that would need to be made available to the auditor.

66.     On March 1, 2007, LM attempted to conduct an audit of ACEO.

67.     On March 5, 2007, LM's auditor wrote to Mike Adams (of ACEO) regarding the March 1st audit as follows:

> Thank you for meeting with Ms. Austin and me last Thursday, March 1st and taking my call this afternoon.
>
> At the March 1st audit, you would not provide copies of your client's written contracts as recommended by your counsel. As we explained, the client contracts are

business records needed to determine the proper premium for the policy. Our policy contract requires ACEO to provide these records. Failure to comply with our request will result in your policy being cancelled for non-compliance with the terms and conditions of your policy contract. Should you reconsider your position, please send me complete copies of all client contracts to the above address.

We also discussed the issue of ACEO's duplicate coverage in Illinois. An employer is required to cover all employees. Since Liberty Mutual is the carrier for workers' compensation coverage, we must cover all employees and accordingly charge an appropriate premium.

**68.** On April 9, 2007, LM's auditor had a phone conversation with Andrew Jones (ACEO's attorney). As memorialized by LM's auditor (amongst other matters):

I [LM's auditor] also brought up issue of IL coverage - LM is covering all clients. We did not receive the information. He asked why. We provide coverage to ACEO and cover all employees in the state of IL.

I also stated the contracts did not appear to be complete. He stated he sent what he was provided by ACEO.

I stated I would go through the information and let him know what I am missing. I mentioned I would be traveling and hopefully would get back to him in a few days or so.

**69.** On April 18, 2007, LM's auditor wrote to ACEO stating, amongst other matters, the following:

I had requested copies of all client contracts. The copies you provided were incomplete nor were copies provided for all clients. I had also requested that you identify the client locations. This information was not provided. Please provide the documentation as requested.

**70.** On May 16, 2007, LM's auditor wrote to Mike Adams (of ACEO) and stated the following:

Thank you [for] taking my call this past Monday. This letter is to confirm our appointment to conduct the Workers' Compensation audit for the above policy [i.e., the LM policy]. We have scheduled an appointment for Wednesday, May 30th @ 9:00 AM at your office located at 111 East Broadway, Columbia, Missouri.

15

To start the process, I will need the following books and records:

> Payroll for <u>all</u> clients by state, WC code and employee. This information was previously supplied on a report named the "Workers' Compensation recap."

> The 941s and state unemployment reports for the 1st qtr 2007.

> The payroll invoice register (electronic version) and invoices (made available).

> An updated client list with the contact names and phone numbers.
> trial balance.

> Copies of the client contracts.

> Updated coverage information for states not insured by Liberty Mutual.

The above information should allow me to start the audit process. However, Liberty reserves the right to request additional records if needed.

During our conversation, I asked about the status of the information requested in my April 19th fax/e-mail to you. You stated the information would be sent to me this week. I look forward to receiving it.

On April 27th, I sent you a fax with a list of clients which I have been unsuccessful in contacting as part of the verification process. Please have the clients contact me as soon as possible to facilitate the audit process.

Should you have any questions, please feel free to give me a call. Your anticipated cooperation in providing the records is greatly appreciated.

**71.** On May 30, 2007, LM conducted an audit of ACEO.

**72.** At the May 30th audit (as documented in a letter written by the auditor to ACEO), ACEO refused to provide: a) workers' compensation recaps for all employees paid during the respective policy period, b) client contracts, and c) assistance in verifying the duties of employees working at a number of ACEO's clients.

16

**73.** More specifically, amongst other matters, the LM auditor recorded the following as

occurring at the May 30th audit:

ID [i.e., Ivan Dobrin of ACEO] stated ACEO would provide Liberty only the records for the clients in IL, which ACEO believes, are insured by Liberty...

\*\*\*

ID asked if Liberty's intent was to include all IL clients. I responded, yes. Liberty provided coverage in IL therefore we are obligated to include the exposure. ID stated the insured has a policy with AIG in IL. He explained that AIG's policy was written subsequent to the LM coverage. AIG only agreed to pick up certain clients. I explained the insured could have the LM policy cancelled and pay back the claims & expenses or have AIG drop their IL coverage.

I explained once AIG bound coverage, ACEO was no longer eligible for coverage. Explained the process - LM covers all employees in IL and records for them are needed. ID stated the insured was not willing to provide information on all IL clients. ID then made comment about ending the meeting. Explained that I traveled for the appointment. Insured should extend the courtesy of providing the information.

\*\*\*

ID stated it was not ACEO's intent to cheat the insurance companies (he made that comment several times). Stated ACEO does not want to be double billed. I stated we had policy which covers the IL employees. Coverage is not split by employee or client. AIG should not be entitled to the exposure. ID made comment of policy language - not stating it covers all employees. I stated it covers all operations for a state listed in 3A. Liberty is entitled to the premium for anyone that could make us liable. ID had MA [Mike Adams of ACEO] get the policy. ID point to an endorsement which showed 3 waiver jobs. ID pointed and made comment how these are the only clients listed. I explained the three for the waivers of subro.

\*\*\*

JH [Roy Hombs of ACEO] asked would Liberty pick up all of the payroll and claims. I stated that is fine, either Liberty or AIG should have all of the exposure along with claims. ID stated AIG will not cover all of the clients. ID then made comment how that would not be good for ACEO since the company is on a deductible and pool rates are higher. I reiterated - policy covers all employees in a state. Policy is not client specific.

\*\*\*

I asked about client verification. I have not heard from the remaining clients which need to be verified. MA stated the broker and Atty Jones informed the clients not to call back. I advised that I will determine the codes using my own research.

74.     On June 7, 2007, the LM auditor submitted the audit for the LM Policy using the available information.  In his cover letter, the LM auditor stated:

> Please find enclosed your copy of the Workers' Compensation audit, which is based on the information that you have provided to me.
>
> For the audit, I had requested the Workers' Compensation recap for the entire payroll for the audit period.  You refused to provide the requested documentation.  At this time, Liberty Mutual must consider ACEO, Inc to be non-compliant with our request for audit information. Your failure to provide the requested books and records could result in ACEO's inability to secure Workers' Compensation coverage through the Workers' Compensation Insurance Plan.

75.     LM subsequently further revised the audit figures, resulting in the present estimated premiums owing in the amount of $3,922,061.00.

## G:  Issues Regarding ACEO

76.     On information and belief, ACEO attempted to disguise the scope of its Illinois operations by applying for coverage as a temporary labor contractor in Nevada and then subsequently requesting that Illinois be added to the LM Policy.

77.     At the time of its application for coverage, ACEO was ineligible for coverage because a company affiliated with ACEO had an outstanding premium debt, and had ACEO correctly answered the application questionnaire, its ineligibility would have been made known.

78.     Subsequently, at approximately the same time that ACEO requested that Illinois be added to the LM Policy, ACEO improperly obtained partial coverage in the voluntary market (i.e., the AIG Policy) and then attempted to improperly split its clients' Illinois payroll exposure between the LM Policy and the AIG Policy.

79.     When ACEO requested LM to add Illinois exposure to the LM Policy, ACEO failed to inform LM of the existence of the AIG policy.

18

80.     Throughout the time period of the LM Policy, ACEO manifested a continuing pattern of non-cooperation and non-disclosure with respect to the audit.  ACEO's actions included dilatory delay, the outright refusal to produce documents and the refusal to fully disclose its Illinois exposure.

81.     On information and belief, ACEO also attempted to lower its premium obligation by misclassifying the operations (i.e., the class codes) of a number of its clients.  This misclassification was documented by LM in its subsequent client verification part of the audit - which showed a number of ACEO's clients who were clearly misclassified.

82.     On information and belief, both in its application and during the audit process, ACEO characterized itself as a staffing/temp company when (at least with regards to a substantial portion of its Illinois payroll exposure) it was in fact a PEO/employee leasing company.

83.     To date, ACEO has refused to pay premiums that are due and owing.

### III.  ALLEGATIONS

### Count One
### Breach of Contract - ACEO

84.     Plaintiff LM realleges paragraphs 1-83 as if same were fully stated herein.

85.     In consideration of the promise to pay premiums as they became due and owing, Plaintiff LM issued to Defendant ACEO workers' compensation insurance policy #WC5-39S-305812-016.

86.     Regarding ACEO's premium obligation, the pertinent contractual language for same has been previously set forth herein at paragraph 36.

87.     Regarding ACEO's obligation to cooperate with the premium audit, the pertinent contractual language for same has been previously set forth herein at paragraph 36.

88.     Policy #WC5-39S-305812-016 is a valid, binding and fully enforceable insurance contract.

89.     Policy #WC5-39S-305812-016 has now expired and Plaintiff LM has performed all conditions precedent required of it pursuant to the aforesaid policy to the degree permitted by Defendant ACEO, as a result of which, and after allowing credit for all payments and credits due, there remain unpaid and outstanding premiums owing to Plaintiff LM by Defendant ACEO.

90.     The Plaintiff has repeatedly endeavored to arrange an audit to determine with exactness the premiums owed by the Defendant, and Plaintiff's right to same is based on the terms and conditions of the policy at issue.  However, the Defendant has repeatedly refused to properly cooperate with the Plaintiff.

91.     Plaintiff LM has also made due demand upon Defendant ACEO to cooperate with the required audit, but the Defendant has, without just cause, refused to do so.

92.     The Defendant's non-compliance with the audit requirements constitutes a breach of the terms and conditions of the insurance contract at issue.

93.     The amount due, outstanding and owing to Plaintiff LM by Defendant ACEO on policy #WC5-39S-305812-016 is presently believed to be $3,922,061.00.

94.     Plaintiff LM has made due demand upon Defendant ACEO to pay the premiums owing, but the Defendant has, without just cause, refused to do so.

95.     The Defendant's failure to pay insurance premiums due and owing constitutes a breach of the terms and conditions of the insurance contract at issue.

WHEREFORE, the Plaintiff, LM Insurance Corporation, prays for judgment against Defendant ACEO, Inc., in the presently ascertainable amount of $3,922,061.00, plus costs arising from the necessity of bringing this action, and all other relief this Honorable Court deems fair and just.

### Count Two
### Statutory Recovery of Interest - ACEO

**96.** Plaintiff LM realleges paragraphs 1-95 as if same were fully stated herein.

**97.** Pursuant to 815 ILCS 205/2, the Plaintiff specifically requests the payment of interest, with said interest commencing on the date policy #WC5-39S-305812-016 ended.

**98.** Policy #WC5-39S-305812-016 ended April 10, 2007. Accordingly, the Defendant owes the Plaintiff statutory interest, accumulating and compounding continually since April 10, 2007, on the premium debt of $3,922,061.00.

WHEREFORE, the Plaintiff, LM Insurance Corporation, prays for judgment against Defendant ACEO Inc., for the full statutory interest, accumulating continually until paid, and all other relief this Honorable Court deems fair and just.

### Count Three
### Negligent Misrepresentation/Omission - ACEO

**99.** Plaintiff LM realleges paragraphs 1-98 as if same were fully stated herein.

**100.** As previously set forth, on or about in May of 2006, ACEO submitted to the Nevada Plan an application for workers' compensation insurance ("the application").

**101.** An applicant for insurance has a good faith duty to make full, accurate and truthful disclosures regarding all information that may affect the risk being insured.

21

102. Under Illinois law, an insurer may rely on the insured's statements contained in the insurance application, and is under no duty to investigate the truth of the applicant's statements.

103. The application for insurance submitted by ACEO was signed by David Jatho (ACEO's president), and contained an applicant's statement. Pursuant to the applicant's statement, the applicant "certifies that he/she has read and understands the statements in this application" and "certifies that any and/or all responses provided in or to this application are true and accurate."

104. Pursuant to the applicant's statement, the applicant further agreed, "To maintain a complete record of all payroll transactions in such form as the insurance company may reasonably require and that such record will be available to the company at the designated address."

105. Although ACEO certified that the statements contained in its application were true, ACEO's application, signed by David Jatho, contained significant and material misrepresentations and omissions.

106. For example, but not by way of limitation, ACEO, with full knowledge of the fact that it was a PEO/employee leasing company, submitted its application for workers' compensation insurance and inaccurately stated that it was a temporary staffing company (as opposed to PEO/employee leasing company).

107. ACEO's application also contained other material inaccuracies. For example, but not by way of limitation, ACEO's response to question #20 (of the General Information Section) and questions #2, #4, #5 and #7 (of the Supplemental Section) all were "No," when in fact the correct answers (which would have permitted appropriate follow up the by the Plan and the insurer) were "Yes."

**108.** Thus, in its application, ACEO described itself as a temporary staffing company, and ACEO answered in the negative when it was asked whether it leased employees to or from any other employers. ACEO's President affirmatively represented that ACEO "...provides employees and services on a temporary basis to companies as a substitute for permanent employment."

**109.** Thus, in its application, ACEO also answered in the negative when it was asked whether there were any undisputed or unpaid workers' compensation insurance premiums from either ACEO itself or any other commonly owned or managed companies.

**110.** In addition, during the policy period at issue, ACEO failed to act in a reasonable manner, and negligently misled and misinformed the Plaintiff as to ACEO's true payroll exposure, and the consequential and correct premiums arising and owing from same.

**111.** For example, in its application ACEO represented that it had a relatively small payroll exposure (of $67,000) in two class codes, resulting in a total estimated premium of only $2,838.

**112.** In fact, ACEO's total payroll exposure under the LM policy was approximately twenty-nine million dollars - of which approximately twenty-eight and a half million dollars was attributable to Illinois.

**113.** Defendant ACEO misrepresented and omitted material facts from Plaintiff LM with the intent to induce LM into issuing workers' compensation insurance coverage for ACEO at a cost substantially lower than the true premium exposure.

**114.** LM reasonably relied on the materially incomplete and inaccurate information provided to it by ACEO, and issued and maintained the workers' compensation insurance policy at issue.

115.     As a direct and proximate result of ACEO's negligent misrepresentations and omissions, LM has suffered damages in the amount of $3,922,061.00.

WHEREFORE, the Plaintiff, LM Insurance Corporation, prays for judgment against Defendant ACEO, Inc. in the amount of $3,922,061.00 plus costs arising from the necessity of bringing this action, and all other relief this Honorable Court deems fair and just.

### Count Four
### Negligence - ACEO

116.     Plaintiff LM realleges paragraphs 1-115 as if same were fully stated herein.

117.     At all times material herein, including at the time of its insurance application, Defendant ACEO had a good faith duty to its insurer (Plaintiff LM) to make full, accurate and truthful disclosures regarding all information that may affect the risk being insured.

118.     In addition, Defendant ACEO had a duty to inform its insurer (Plaintiff LM) of any changes in operations that may occur after the issuance of the insurance policy, as well as any other material facts that became known which varied from the information contained in the application for insurance and that were material to the policy of insurance.

119.     ACEO breached its duties of care to LM.

120.     For example, but not by way of limitation, ACEO, with full knowledge of the fact that it was a PEO/employee leasing company, submitted its application for workers' compensation insurance and inaccurately stated that it was a temporary staffing company.

121.     ACEO's application also contained other material inaccuracies.  For example, but not by way of limitation, ACEO's response to question #20 (of the General Information Section) and questions #2, #4, #5 and #7 (of the Supplemental Section) all were "No," when in fact the correct

answers (which would have permitted appropriate follow up the by the Plan and the insurer) were "Yes."

122.    In addition, during the policy period at issue, ACEO failed to act in a reasonable manner, and negligently misled and misinformed the Plaintiff as to ACEO's true payroll exposure, and the consequential and correct premiums arising and owing from same.

123.    For example, but not by way of limitation, ACEO was negligent in its attempt to disguise the scope of its Illinois operations by applying for coverage in Nevada and then subsequently requesting that Illinois be added to the LM Policy.

124.    In addition, but not by way of limitation, ACEO was negligent in even obtaining the LM Policy because ACEO was ineligible for coverage because a company affiliated with ACEO had an outstanding premium debt.

125.    In addition, but not by way of limitation, ACEO was negligent in requesting that Illinois be added to the LM Policy, because ACEO had improperly obtained partial coverage in the voluntary market (i.e., the AIG Policy) and then attempted to improperly split its clients between the LM Policy and the AIG Policy.

126.    ACEO knew, or reasonably should have known, that its careless actions would cause damage to the Plaintiff. Said actions include, but are not limited to: a) material inaccuracies in its application, b) being ineligible for coverage under the Plan, c) material inaccuracies in the reporting and disclosure of its Illinois Payroll exposure, d) material inaccuracies in its classification of operations, e) ongoing non-cooperation with the audit, and f) attempting to improperly split the policy coverage.

**127.** Plaintiff LM would not have been damaged in this case, but for ACEO's numerous and careless acts of negligence.

**128.** As a direct and proximate result ACEO's careless and negligent conduct, LM has suffered damages in the amount of $3,922,061.00.

WHEREFORE, the Plaintiff, LM Insurance Corporation, prays for judgment against Defendant ACEO, Inc. in the amount of $3,922,061.00 plus costs arising from the necessity of bringing this action, and all other relief this Honorable Court deems fair and just.

**Count Five**
**Professional Negligence/Malpractice - Alliance Insurance**

**129.** Plaintiff LM realleges paragraphs 1-128 as if same were fully stated herein.

**130.** At all times material herein, Alliance Insurance was an insurance agency believed to be duly licensed to practice its profession and to have so held itself out to the public.

**131.** As a duly licensed insurance agency, Alliance Insurance was required to familiarize itself with, and understand and adhere to, all applicable rules, regulations and policy provisions regarding the relevant policy produced.

**132.** As a duly licensed insurance agency, Alliance Insurance had a duty to fully disclose to the insurer (i.e., Plaintiff LM) the risks and hazards of the insured (i.e., ACEO), including but not limited to disclosure of facts and information that would affect exposure and premiums.

**133.** As a duly licensed insurance agency, Alliance Insurance had a duty to inform the insurer of any changes in operations that may occur after the issuance of the insurance policy, as well as any other material facts that became known that varied from the information contained in the application for insurance and that were material to the policy of insurance.

134.    In addition, but not by way of limitation, the Plan imposes duties and responsibilities upon those insurance agents who participate in the Plan.

135.    Under the Plan, it is the insurance agent's duty and responsibility to keep the servicing carrier (i.e., Plaintiff LM) fully advised of any changes in the insured's name, ownership, operations, payroll, locations, or other new exposures that would effect coverage, classifications, rates, premium estimates, or other aspects of the coverage.

136.    In addition, but not by way of limitation, the insurance agent's duties and responsibilities under the Plan include the following:

a)    Assist the employer in meeting his obligations under the Illinois Workers' Compensation Law, preferably by securing coverage in the voluntary market. Failing to obtain such coverage, then the agent has the responsibility to assist the employer in obtaining coverage under the Plan in a prompt and efficient manner. Even if coverage must be placed in the Plan, the agent has the continuing responsibility to try to place the coverage in the voluntary market. The agent must explain to the employer the necessity for securing coverage in the Plan.

b)    Assist the employer needing coverage in the Plan in completing thoroughly and accurately an application and any other documents that may be required, and in forwarding these promptly to the Council.

c)    Promptly report to the servicing carrier all changes in the employer's name, operations, exposures, locations, financial condition or other changes which may affect the policy or the services being provided. Keep the policy up to date by promptly requesting endorsements as required.

d)    See that adequate deposit and advance premiums are maintained and encourage the employer to realistically estimate payrolls.

e)    Determine the coverage the employer needs for both Illinois and out of state operations. Secure such coverage, as available, from the servicing carrier or other Plans, Pools or Funds, if necessary.

f)    Promptly forward all premium payments received from the employer to the servicing carrier to avoid credit cancellations and lapses in coverage. Encourage the employer

to meet all premium payments, and, if any, finance company obligations in a timely manner.

g)  Advise the employer in all matters relating to the Workers' Compensation Insurance. Request information on the insured's behalf, as needed, from the servicing carrier or Council.

h)  Promptly refund any excess commissions paid by the servicing carrier when requested to do so.

137.  In addition, but not by way of limitation, the Plan also imposes important restrictions and conditions upon an agent regarding the issuance of certificates of insurance. For example, but not by way of limitation, the Plan requires that the agent provide the insurer with a copy of each certificate issued.

138.  Alliance Insurance breached its duties to LM by failing to fully disclose to the Plaintiff the risks and hazards of the insured, including but not limited to disclosure of facts and information that would affect exposure and premiums.

139.  Alliance Insurance's breaches of its duties to LM include, but are not limited to, the following: a) material inaccuracies in ACEO's application, b) failing to advise that ACEO was in fact ineligible for coverage under the Plan, c) failing to timely and properly report ACEO's Illinois Payroll exposure, and d) improperly "splitting" coverage by obtaining coverage in the voluntary market and failing to timely advise the Plaintiff of same.

140.  Alliance Insurance further breached its duties to LM by making ongoing inaccurate and incorrect representations regarding the true state of affairs of ACEO.

141.  LM reasonably relied on the competency, representations and actions of Alliance Insurance, and its presumed knowledge of its role and responsibilities under the Plan.

28

142.     The failure of Alliance Insurance to adhere to the accepted standard of care was a direct and proximate cause of the loss suffered by Plaintiff LM.

143.     By reason of this matter Plaintiff has been and is damaged in an amount presently ascertained as being $3,922,061.00.

WHEREFORE, the Plaintiff, LM Insurance Corporation, respectfully requests that this Honorable Court enter judgment in favor of Plaintiff LM Insurance Corporation and against Defendant Alliance Insurance Group, Inc., for damages suffered in the presently ascertained amount of $3,922,061.00, and all other relief this Honorable Court deems fair and just.

### Count Six
### Negligent Misrepresentation/Omission - Alliance Insurance

144.     Plaintiff LM realleges paragraphs 1-143 as if same were fully stated herein.

145.     At all times material herein, Alliance Insurance was an insurance agency believed to be duly licensed to practice its profession and to have so held itself out to the public.

146.     Alliance Insurance was required to familiarize itself with, and understand and adhere to, all applicable rules, regulations and policy provisions regarding the relevant policy produced.

147.     Alliance Insurance had an affirmative duty to fully disclose to the insurer (Plaintiff LM) the risks and hazards of the insured, including but not limited to disclosure of facts and information that would affect exposure and premiums.

148.     Alliance Insurance had an affirmative duty to inform the insurer (Plaintiff LM) of any changes in operations that may occur after the issuance of the insurance policy, as well as any other material facts that became known that varied from the information contained in the application for insurance that were material to the policy of insurance.

149.     In addition, but not by way of limitation, an insurance agency and insurance agent's affirmative duties and responsibilities under the Plan have been previously set forth herein at paragraph 136.

150.     In addition, Alliance Insurance had an affirmative duty to advise the insurer (i.e., Plaintiff LM) of each certificate of insurance being issued by Alliance Insurance.

151.     Alliance Insurance carelessly and negligently breached its duties to Plaintiff LM by failing to timely and materially inform the Plaintiff as to the exposure arising from various entities' inclusion on to ACEO's workers' compensation insurance policy issued by Plaintiff LM.

152.     Alliance Insurance breached its duty to fully disclose to the Plaintiff the risks and hazards of the insured, including but not limited to disclosure of facts and information that would affect exposure, premiums, premium payments, claims administration and insurability.

153.     Alliance Insurance's negligent misrepresentations and omissions include, but are not limited to: a) material inaccuracies in ACEO's application, b) failing to advise that ACEO was in fact ineligible for coverage under the Plan, c) failing to timely and properly report and disclose ACEO's Illinois Payroll exposure, and d) improperly "splitting" coverage by obtaining coverage in the voluntary market and failing to timely advise the Plaintiff of same.

154.     Alliance Insurance made ongoing inaccurate and incorrect representations regarding the true state of affairs of ACEO.  In addition, Alliance Insurance continually omitted and otherwise failed to disclose the true state of affairs of ACEO vis-a-vis the insurance coverage being provided by Plaintiff LM.

155.   Defendant Alliance Insurance misrepresented and omitted material facts from Plaintiff LM with the intent to induce LM into issuing workers' compensation insurance coverage for ACEO at a cost substantially lower than the true premium exposure.

156.   In direct and reasonable reliance on Defendant's negligent misrepresentations and omissions LM provided workers' compensation insurance coverage for ACEO.

157.   The failure of Alliance Insurance to adhere to the accepted standard of care was a direct and proximate cause of the loss suffered by Plaintiff LM.

158.   By reason of this matter Plaintiff has been and is damaged in an amount presently ascertained as being $3,922,061.00.

WHEREFORE, the Plaintiff, LM Insurance Corporation, respectfully requests that this Honorable Court enter judgment in favor of Plaintiff LM Insurance Corporation and against Defendant Alliance Insurance Group, Inc., for damages suffered in the presently ascertained amount of $3,922,061.00, and all other relief this Honorable Court deems fair and just.


Respectfully submitted,

LM INSURANCE CORPORATION


By: _____ s/ James T. Barnes _____
                One of its attorneys


James T. Barnes, Esq. (# 6211950)
Barnes, P.C.
431 South Dearborn Street
Suite 506
Chicago, IL 60605
(312) 939-5859