IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| LM INS. CORP., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| | ) | No. 08 C 2372 |
| v. | ) | |
| | ) | Judge John A. Nordberg |
| ACEO, INC. *et al.*, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

**Introduction**

This is a fraud case concerning the business of supplying workers' compensation insurance to employers. The defendants – a group of interrelated corporations owned and operated by defendants Roy Hombs and David Jatho – were intermediaries providing workers' compensation insurance and other services to employers. Plaintiff LM Insurance Corp. ("LM") alleges that defendants engaged in a fraudulent scheme in which they collected millions in premiums from their employer clients but then only passed through to LM, the insurer, a fraction of that amount, fraudulently pocketing the difference.

The parties have completed a long discovery process. Before the Court are two motions. One is a motion for summary judgment filed by only the two individual defendants (Hombs and Jatho). The corporate defendants have not moved for summary judgment. The other is a motion to dismiss filed by one corporate defendant which has entered into a settlement agreement.

**Facts**

The facts are complicated. Plaintiff's second amended complaint is 48 pages. In addition, plaintiff has submitted five binders with 39 exhibits. Set forth below is a summary of the fraudulent scheme as outlined in the complaint.

The Illinois Workers' Compensation Act provides a statutory recovery for injured workers. (2AC, Dkt. # 231, ¶ 14.) The Act requires virtually all employers to insure their entire employee exposure. In Illinois, as in other states, some employers cannot find an insurance

company in the open market. (¶ 16.) To alleviate this problem, states have created a plan to provide such insurance (the "Plan"). (¶ 17.) To apply, an employer must fill out a written application estimating annual premiums and stating the location and nature of its business activities (among other information). (¶ 18.) This information is important because it is used to determine the premiums owed and whether an employer is eligible for coverage. Employers are therefore required to certify that the factual representations made on the application are true. (¶ 19.) Employers also have a continuing obligation to advise the insurer of any changes to payroll, locations, or new coverage because such changes could affect coverage and the premiums owed. (¶ 20.) The insurance application is given to the administrator of the Plan, the National Council on Compensation Insurance, which randomly assigns it to an insurance company. (¶ 21.)

There is an added layer here. Defendant ACEO, Inc. was a professional employer organization ("PEO"). A PEO provides companies with human resource, payroll, and workers' compensation insurance services. (¶ 23.) The PEO enters into an agreement with the companies and obtains workers' compensation insurance coverage on their behalf. (¶ 24.)

In May 2006, ACEO submitted an application for workers' compensation insurance to the Nevada Plan. In the application, ACEO denied that it was a PEO. (¶¶ 37- 38.) ACEO also denied that it or any related company had unpaid workers' compensation premiums. (¶ 39.) Plaintiff alleges that these (and other) representations were untrue. Based on the application, LM issued ACEO a worker's compensation policy for May 8, 2006 through May 8, 2007. (¶ 42.)

On July 13, 2006, defendant Alliance Insurance Group, Inc. wrote LM asking it to add coverage on the ACEO policy for payroll exposure in Kansas and Illinois. (¶ 45.) Alliance Insurance stated that ACEO currently had no exposure in Illinois, although it was trying to get a "few companies" as clients. However, ACEO at this time knew that it in fact already had substantial Illinois exposure, which later was shifted to LM's policy. (¶ 46.)

In December 2006, LM began investigating ACEO after discovering an insurance certificate issued for an ACEO client located in Wisconsin. (¶ 62.) On January 4, 2007, LM informed ACEO that LM would be cancelling the policy because ACEO was ineligible for coverage. (¶ 63.) The cancellation was effective April 10, 2007. (¶ 67.)

LM now alleges that ACEO and the related companies run by Hombs and Jatho engaged in fraudulent scheme. They attempted to disguise the scope of ACEO's Illinois operations by applying for coverage as a temporary labor contractor in Nevada and then requesting that Illinois be added to the same policy. (¶ 85.) They did so even though ACEO was ineligible for coverage because one of its affiliated companies had a premium debt. (¶ 86.) If this fact had been revealed by ACEO when it filled out the application, then LM would have denied coverage.

As a PEO, ACEO should have passed through to LM the money it received from its PEO clients. (¶ 90.) Instead, ACEO charged those clients over 4 million dollars for Illinois insurance, but then gave to LM only a fraction of that amount. LM also discovered that ACEO tried to

lower its premium obligations by misclassifying the work its clients were doing. (¶ 91.) Plaintiff asserts claims for breach of contract, negligence, fraud, and alter ego liability.

## Analysis

I.      **The Summary Judgment Motion.**

The two individuals have moved for summary judgment in their favor on the counts directed against them individually and on their affirmative defenses. The gist of their motion is that there is no basis for holding them personally liable. In considering a summary judgment motion under Rule 56, this Court must determine whether there are genuine issues of material fact. *McCleskey v. DLF Constr., Inc.*, 689 F.3d 677, 679 (7th Cir. 2012). In a case such as this one, where the parties engaged in lengthy discovery and the facts are complex, this determination can be difficult. This is one reason why the Local Rules set forth a strict process for the parties to follow in briefing a summary judgment motion. *FTC v. Bay Area Bus. Council, Inc.*, 423 F.3d 627, 633 (7th Cir. 2005) ("we have consistently upheld the district court's discretion to require strict compliance with [local rules like Rule 56.1]"). This process is designed to simplify the factual record and minimize the time spent by the Court sorting through piles of documents and figuring out exactly where the parties are in disagreement. *See United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs.").

Unfortunately, this process has not worked in this case because counsel for defendants has repeatedly failed to comply with Local Rule 56.1. Counsel's original statement of material facts was non-compliant. Counsel failed to provide record citations for the facts in paragraphs 49, 52-62, 69-76, 78-79, 81, 83-85, 87, 89-94, 96-97, 99-102. *See* Dkt. # 253 at 5. After plaintiff filed a motion complaining about this and other failures, we ordered defendants' counsel to submit a revised statement. (Dkt. # 257.) Though arguably better, the new statement was not fully compliant. *See* Dkt. # 266 at 3-4. Also non-compliant was counsel's response to plaintiff's Rule 56.1 statement of additional facts. (Dkt. # 281.) For 32 of the 40 responses, counsel failed to cite to any fact in the record. *Id.* at 3. Counsel again had to re-do his submission.

It is not just that counsel's submissions have been lacking in factual support, it is also that they are contradictory or confusing in critical places. Consider, for example, counsel's statements regarding the factual issue of *who* signed the allegedly fraudulent insurance application. This fact is but one small link in a larger chain of proof. It would seem to be a simple fact to pin down. Yet, rather than providing a direct answer, defendants' counsel forced this Court and opposing counsel to walk through an obstacle course. Counsel's initial and amended Rule 56.1 statements confusingly stated, in back-to-back paragraphs, that the application was signed by David Jatho (Fact No. 6) and by Jerrid Woodhurst (Fact No. 7). Did this mean that there are two signatures on the same document? Counsel did not explain. More problematic is that we cannot find any evidence to support counsel's claim that Jerrid Woodhurst signed the application. The obvious document to determine who signed the insurance application is the application itself. Reviewing this document, which is plaintiff's Ex. 16, we cannot find

Woodhurst's signature anywhere on the document. Jatho's signature appears in two places – at p.264 and p.266. To support his claim that Woodhurst signed the application, counsel cited to the affidavit of Jatho, but the affidavit nowhere says Woodhurst signed the application. *See* Dkt. # 259-1 at 3-4. It thus appears that defendants' counsel's Fact No. 7 is a false statement – one easily proven as false.[1]

Later, in responding to plaintiff's statement of facts, counsel continued to hedge on the question of who signed the application. Plaintiff's Fact No. 9 states that Jatho signed the application. Counsel's response, quoted in its entirety, is the following Zen koan: "Denied as to Jatho and Hombs individually." What does this mean? Is counsel taking the position that Jatho didn't sign the application at all or is he arguing that he didn't sign it "individually" and if so, what does the latter assertion mean? Counsel easily could have clarified his answer. Plaintiff was consequently forced to file yet another motion objecting to counsel's improper submission. Instead of responding to plaintiff's motion, counsel again adopted a fall-back-and-retreat strategy of submitting a revised response. In this document, counsel finally admitted directly that only David Jatho signed the application. (Dkt. # 284 at 7.) There is no good explanation for why it took counsel four tries (over several months and after the filing of two motions by plaintiff) to provide an unambiguous answer to a simple question.

The problem described above is not isolated and there are many other similar examples in counsel's submissions. During the long discovery process, Magistrate Judge Cole expressed a similar frustration, noting that there had been "a long series of unapologetic failures by the defendants and their lawyers to abide by their obligations to participate fully and fairly in discovery."*LM Ins. Corp. v. ACEO, Inc.*, 276 F.R.D. 592, 592-93 (N.D. Ill. 2011). Counsel's ongoing failure to comply with the Local Rules is a sufficient ground to deny the summary judgment motion outright without further analysis.

However, to provide the parties with guidance for their trial, we will consider defendants' main arguments. They all are directed at only those counts seeking to hold the two men individually liable. Their main argument is a factual contention: they did not participate in or know about the corporate wrongdoing. In making this argument, defendants concede that fact disputes exist about whether the corporate defendants (none of whom have moved for summary judgment) committed fraud. *See* Defs. Reply at 5. Therefore, under Rule 56, we proceed under the assumption that the corporate defendants lied on the insurance application, hid millions of

---

[1]We understand that counsel is arguing that, although Jatho signed the insurance application, Woodhurst filled it out and is thus supposedly responsible for the false statements. But this defense, putting aside its believability, is no excuse for equivocating about the separate question of who *signed* the application.

-4-

dollars in insurance premiums, received kickbacks from their clients, and issued fraudulent insurance certificates.[2]

The individual defendants attempt to portray themselves as essentially outsiders in their own companies. They say that they "spent most of their time on sales, some of their time on administrative functions, and delegated everything else to the businesses' employees." (Dkt. # 258 at 6.) They blame the fraud on lower level employees. They assert, for example, that the false statements on the insurance application were made by Jerrid Woodhurst. In other words, even though Jatho signed the application and certified that the statements made on it were true, he supposedly did not know that they were false because he delegated the job to Woodhurst.

A jury could find these explanations unbelievable. As described above, the alleged fraud is widespread and involved many actions over an extended period. Given that these two men owned, controlled, and ran all the corporate entities, it would be reasonable (absent other evidence) to conclude they had some awareness of what was going on. *See* Pl. Facts 8-9. In addition, several witnesses testified that the two men were heavily involved in the daily operation of their companies. One witness agreed that the two men were "hands-on in terms of their daily interaction with the company." (Pl. Ex. 11 at 14.) Another testified that Hombs was in charge of "the insurance side of things." (Pl. Ex. 13 at 12.) As for defendants' claim that Woodhurst filled out the application by himself, Woodhurst testified that he got the information needed to fill out the application from Jatho and Hombs and Finke. (Pl. Ex. 8 at 33.)

There is also circumstantial evidence that the individual defendants were involved in specific aspects of the fraudulent scheme. For example, plaintiff has alleged that defendants changed the workers' compensation code for a company called Classic Roofing from "roofing" (more risky and thus higher premiums) to "carpentry" (lower risk and premiums). This meant that the defendants were able to charge higher premiums but only pass through the lower premiums to plaintiff. (Pl. Fact 19.) To support this allegation, plaintiff submitted a copy of the signature page of the contract signed by Classic Roofing. (Pl. Ex. 20 at 8.) It lists the classification code as roofing. However, the copy later counter-signed by Jatho has the roofing code crossed out and the carpentry code written above it. (Pl. Ex. 21 at 8.) The evidence suggests that *someone* changed the code, a point further supported by deposition testimony from a Classic Roofing employee. (Pl. Ex. 1 at 32-33.) A reasonable jury could conclude that Jatho, the person signing the document, either participated in or knew about the fraudulent change to the document. In sum, we find that a dispute exists about whether the two men played an active, personal role in the fraud. Under Rule 56, this means that we must construe this dispute in favor of the non-moving party, the plaintiff, and proceed under the assumption the two men were involved in the fraud.

---

[2]It should be noted that plaintiff has provided the Court with detailed and well-organized evidence – consisting of 39 exhibits in five binders – that clearly are enough to create a fact dispute as to whether the corporate defendants committed fraud.

We next consider the legal standard for individual liability for fraud under Illinois law. In *Express Valet, Inc. v. City of Chicago*, 869 N.E.2d 964 (Ill. App. Ct. 2007), the Illinois Appellate Court provided the following summary:

> Although corporate officers are generally not liable for the corporation's torts (*National Acceptance Co. of America v. Pintura Corp.*, 94 Ill.App.3d 703, 706, 50 Ill.Dec. 120, 418 N.E. 2d 1114 (1981)), a corporate officer is individually liable for fraudulent acts of his own or those of the corporation in which he participates (*Allabastro v. Cummins*, 90 Ill.App.3d 394, 398, 45 Ill.Dec. 753, 413 N.E.2d 86 (1980)); see also *Citizens Savings & Loan Ass'n v. Fischer*, 67 Ill.App.2d 315, 323, 214 N.E.2d 612 (1966) ("The rule is that whoever participates in a fraudulent act is guilty of fraud"). A corporate officer is liable for the fraud if he "'with knowledge, or recklessly without it, participates or assists in the fraud.'" *People ex rel. Hartigan v. E & E Hauling, Inc.*, 153 Ill.2d 473, 502, 180 Ill.Dec. 271, 607 N.E.2d 165 (1992), quoting *Murphy v. Walters*, 87 Ill.App.3d 415, 418-19, 43 Ill.Dec.107, 410 N.E.2d 107 (1980).

*Id.* at 976. Applying this standard here, we find that the evidence discussed above is enough to allow a reasonable jury to conclude that the two men participated in the corporate fraud and therefore are individually liable. The summary judgment motion is therefore denied as to Count Four.

We next consider the negligence counts. At issue is the potential application of the *Moorman* doctrine, also known as the economic loss rule, which bars recovery in tort for economic losses. *R.J. O'Brien & Assocs., Inc. v. Forman*, 298 F.3d 653, 656 (7th Cir. 2002). The parties agree that for plaintiff to prevail, it will have to show that defendants are in the "business of supplying information for the guidance of others." *Id.* Initially the briefs were focused on whether the corporate defendants were in such a business, but defendants in their reply brief have clarified that they are now only arguing that Hombs and Jatho, acting individually, were not engaging in such a business. Defs. Reply at 8 (acknowledging that the corporate defendants "were in the business of supplying information and owed duties to LM").

This concession simplifies the inquiry. Is there evidence that these two men individually held themselves out as engaged in a PEO business? Plaintiff has not submitted evidence that would allow a reasonable jury to conclude that the two men were working in a dual capacity, both for their corporations and then separately holding themselves out as operating their own business. The only evidence plaintiff has submitted is a brochure entitled "The Alliance Companies Profile." (Pl. Resp. at 5 n.3; Pl. Ex. 35.) But this document is focused on the corporate entities and describes the two men as officers and owners of those companies. This brochure falls far short of establishing that the two men engaged in a separate individual business distinct from the corporate entities. *See LaSalle Bank Nat'l Assoc. v. Epstein*, 2001 WL 930793, *8 (N.D. Ill. Aug. 15, 2001) ("LaSalle cites no case law where a corporate officer or CFO is held to be in a *different* business than his corporate employer for purposes of the *Moorman* doctrine exception") (emphasis in original); *First Nat'l Bank of Boston v. Une*, 1988

WL 130050, *3 (N.D. Ill. Nov. 23, 1988). For these reasons, we grant summary judgment to Hombs and Jatho on Counts Two and Three. These counts will remain as to the other defendants named therein.

We turn next to Count eight, the alter ego claim. It is directed against all the defendants, including the two individuals, and seeks recovery jointly and severally against all of them. Although shareholders are normally insulated from liability for the acts of the corporation, "a court may disregard a corporate entity and pierce the veil of limited liability where the corporation is merely the alter ego or business conduit of another person or entity." *Peetoom v. Swanson*, 778 N.E.2d 291, 294-95 (Ill. App. Ct. 2002). The doctrine is an equitable remedy designed to prevent "fraud or injustice" perpetrated against third parties dealing with the corporation. *Id.* Under Illinois law, veil piercing is permitted when two requirements are met: (I) "'there must be such unity of interest and ownership that the separate personalities of the corporation and the individual' no longer exist" and (ii) "'circumstances must be such that adherence to the fiction of separate corporate existence would sanction a fraud or promote injustice." *Wachovia Securities, LLC v. Banco Panamericano, Inc.*, 674 F.3d 743, 751-52 (7th Cir. 2012) (internal citations omitted).

Plaintiff relies on these facts to meet this standard:

29. Defendants David Jatho and Roy Hombs were the co-owners of several companies including, but not limited to, ACEO, Inc., Alliance Staff Services, Inc., Alliance Insurance Group, Inc., Total H.R. Employer Services, Inc., Performance HR, Ltd., Corporate Management Company, and National HR Companies, LLC.

30. As stated in The Alliance Companies Profile brochure, "In 1998, David Jatho and Roy Hombs formed The Alliance Companies, a family of companies including Alliance Staff Services, Inc., Alliance Insurance Group, Inc., Alliance Personnel Solutions, LLC, and ACEO, Inc."

31. The Defendants' employees, regardless of who they were acting on behalf of (or what they did), were all salaried employees of Corporate Management Company.

32. The Defendants' PEO clients were moved from "one company to another company" (*i.e.*, to and from companies belonging to Defendants Jatho and Hombs). As one employee put it, Defendants' PEO clients were moved "here, there and everywhere in order to get certificates taken care of."

33. The Defendants engaged in "constant movement of clients from one PEO to another." [] PEO client Classic Roofing would receive an invoice from ACEO one week, and an invoice from another of the Defendants' companies – Alliance Personnel Solutions – the next week.

34. The Defendants' PEO client Spacemark, Inc. was transferred between Defendant Alliance Staff Services and Defendant ACEO, but as far as Spacemark was concerned the companies were the same. Equally, PEO client Classic Roofing considered them all "the same people."

35. The Defendants' PEO client JK Steel Erectors, Inc. had contracts with several of the Defendants' companies – but at all times it was understood that the employee leasing relationship was with ACEO. As JK Steel Erectors president testified, "To my recollection, we started with ACEO in approximately November of '04, and they sent this – ACEO sent this to me in April of '05 just asking me to renew the contract. It was just another name." As Ms. Cloonen further testified, the Defendants' many companies had the same people, at the same address – just a different name.

(Pl. Facts, ¶¶ 29-35, citations omitted.)

We conclude that these facts are sufficient to create a fact question as to whether the two legal requirements have been met. Defendants have either admitted the above facts were true (¶¶ 29-31) or responded by stating "Denied as to Jatho and Hombs individually"(¶¶ 32-35). These denials, lacking in citations to the record, are insufficient under the Local Rules for the reasons explained above. We therefore take these facts as true for this motion. Defendants also argue, as they have done before, that they were not involved in these actions. We have already concluded above that there is sufficient evidence for a jury to conclude otherwise. Aside from this argument, the defendants argue that each of the defendant corporations had a "distinct function." (Defs. Reply at 10.) This assertion is too general to explain away the specific evidence in ¶¶ 29 through 35. The fact that the corporate entities were supposed to have distinct functions does not mean that they operated that way in practice. The facts submitted by plaintiff show many instances in which these corporate entities operated interchangeably; in reviewing the record, we found it difficult to see any distinct separation between these entities as one corporation would initiate a transaction and another would pick it up later mid-stream.

Finally, as for defendants' affirmative defenses, we find that they clearly involve fact issues not suitable for resolution through a summary judgment motion. The defendants have not provided sufficient evidence or case law to justify the granting of summary judgment in their favor on their defenses of mitigation of damages, equitable estoppel, and laches. As plaintiff correctly states, the defendants' summary judgment evidence supporting their affirmative defenses consists, in many cases, of a simple restatement of the affirmative defense itself. (Pl. Resp. at 15.) Defendants fail to cite to admissible evidence in other instances. (*Id.* at 17.) In their reply brief, defendants devote only three short paragraphs to their affirmative defenses and do not even address the main arguments in plaintiff's response brief. This is not sufficient to carry the burden on summary judgment.

**II.     Motion To Dismiss.**

Alliance Insurance Group, Inc., one of the corporate defendants, has filed a motion to dismiss all claims against it and for a finding that the settlement was made in good faith. (Dkt. # 275.) Alliance Insurance is represented by separate counsel hired by its insurer. Alliance Insurance has entered into a settlement agreement with plaintiff LM in which plaintiff will dismiss the three claims against Alliance Insurance (Counts Five, Six, and Eight) in exchange for $180,000. Alliance Insurance seeks an order by this Court stating that the settlement was made in good and at arm's length with no collusion as defined by the Illinois Joint Tortfeasors Act, 740 ILCS § 100/2(c). If such a finding is made, Alliance Insurance would be "discharged from all liability for any contribution for any other tortfeasor." *Id.* Plaintiff does not oppose the motion. However, the other defendants do oppose the motion.

We begin with the legal test. Set forth below is a summary by the Illinois Supreme Court regarding the good faith determination under the Act:

> The "good faith" of a settlement is the only limitation which the Act places on the right to settle and it is the good-faith nature of a settlement that extinguishes the contribution liability of the settling tortfeasor. The Act, however, does not define the term "good faith," nor does it provide any procedural guidelines as to when or how a good-faith determination is to be made.
>
> * * *
>
> Nor can there be a single, precise formula for determining what constitutes "good faith" within the meaning of the Contribution Act that would be applicable in every case. A settlement will not be found to be in good faith if it is shown that the settling parties engaged in wrongful conduct, collusion, or fraud. Nor will a settlement agreement satisfy the good-faith requirement if it conflicts with the terms of the Act or is inconsistent with the policies underlying the Act. Ultimately, however, whether a settlement satisfies the good-faith requirement as contemplated by the Contribution Act is a matter left to the discretion of the trial court based upon the court's consideration of the totality of the circumstances.

*Johnson v. United Airlines*, 784 N.E.2d 812, 818, 821 (2003) (internal citations omitted).

Defendants do not take issue with this summary of the legal standard. However, they argue, somewhat confusingly, that we should either deny this settlement altogether or that we should broaden it to include all claims against them, even those against the individual defendants for their individual actions. (Dkt. # 289 at 2-4.) We are not persuaded by this argument.

Although the defendants oppose the settlement, they never address the legal standard directly. They offer no evidence to suggest that the settlement was not entered into in good faith after arm's length negotiations. This Court can find no reason, other than sheer speculation, to conclude that this settlement was not made in good faith by counsel for Allied Insurance Group and counsel for plaintiff. There were only three claims asserted against this particular defendant.

We have no basis for concluding that the settlement amount is not reasonable, and defendants have not argued that a different amount is appropriate. In its reply brief, Alliance Insurance states that the settlement agreement and release do cover any claims against the two individual defendants for their acts as agents or employees of Alliance Insurance Group. *See* Dkt. # 292 at 2. For all the above reasons, we find that the settlement was made in good faith under the Contribution Act.

## **Conclusion**

The motion for summary judgment is granted in part and denied in part. Summary judgment is granted to defendants Hombs and Jatho on the negligence claims (Counts Two and Three) only insofar as those claims are directed against them individually. The unjust enrichment claim in Count Seven is dismissed because plaintiff is no longer pursuing that claim. The motion for summary judgment is denied in all other respects.

The motion to dismiss filed by defendant Alliance Insurance Group, Inc. is granted with this Court finding that the settlement was made in good faith within the meaning of the Contribution Act. The claims asserted against Alliance Insurance Group (Counts Five, Six, and Eight) are dismissed with prejudice and without costs.

To give the parties time to confer and see whether any final effort can be made to settle this case, the Court will set a status hearing on September 25, 2013. The parties should submit a joint status report by September 23, 2013.

_____
**JOHN A. NORDBERG**
**Senior United States District Court Judge**

**DATED:** **June 11, 2013**
_____